210 F.2d 283
 NORTHWEST STEEL ROLLING MILLS, Inc. et al.
v.
KENDALL.
 No. 635.
 United States Emergency Court of Appeals.
 Heard at Seattle, Washington, November 20, 1953.
 Decided February 12, 1954.
 Writ of Certiorari Denied May 3, 1954.
 
 See 74 S.Ct. 709.
 DeWitt Williams, Seattle, Wash., William Helsell, Seattle, Wash., on the brief, for complainants.
 John G. Roberts, Atty., Washington, D. C., Warren E. Burger, Asst. Atty. Gen., Edward H. Hickey, Chief, General Litigation Section, Dept. of Justice, and James A. Durham, Acting Gen. Counsel, Israel Convisser, Asst. Gen. Counsel, Washington, D. C., and Bernard A. Goodkind, Atty., Economic Stabilization Agency, New York City, on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 McALLISTER, Judge.
 
 
 1
 Northwest Steel Rolling Mills, Inc., and two of its weighmasters were indicted in the United States District Court for the Western District of Washington, Northern Division, on the charge of unlawfully buying and receiving a truckload of steel scrap, and paying therefor a price in excess of the ceiling price established by the regulations of the Office of Price Stabilization. During the period of the alleged unlawful conduct, the corporate complainant above named was engaged in the business of melting iron and steel scrap and converting it into steel products; and was subject to Ceiling Price Regulation 5 which, in Section 1(b) (1), provided that on and after October 30, 1951, no person should sell, deliver, buy, receive, or prepare iron or steel scrap, or agree or attempt to do so, at prices above those fixed in the regulation.
 
 
 2
 Pending the trial of the criminal case, complainants filed with the district court, as authorized by law, a petition for leave to file a complaint in the United States Emergency Court of Appeals, attacking the validity of the regulation in question; and, upon leave being granted and the criminal proceedings being stayed in the meanwhile, complainants filed their complaint in this court in which they asserted that, in particular, Section 28(n) of Ceiling Price Regulation 5 was invalid because the standards which it adopted with respect to certain steel scrap were vague and indefinite; that the regulation unlawfully delegated the function of defining unprepared steel scrap to private individuals; and that the regulation was ambiguous in that it purported to apply more than one ceiling price to the same scrap items. Complainants contend that they were unable to ascertain, from the regulation, what unprepared scrap consisted of.
 
 
 3
 Specifically, complainants were charged with having purchased unprepared steel scrap — that is, steel scrap defined in Grade 34 of Section 3 of the regulation as "Unprepared steel scrap other than material suitable for hydraulic compression," and having paid overceiling prices therefor.
 
 
 4
 To the complaint, answer was filed by the government and evidence was, by leave of this court, introduced in the form of the presentation of affidavits on behalf of complainants to the Director of Price Stabilization, who was, at the same time, authorized to receive such other evidence as he deemed proper; and the court instructed the director to certify a transcript of such evidence and file the same in this court, together with any statement or opinion the director might choose to make with respect to the foregoing. Such evidence was presented both on behalf of complainants and the government, and appears in the transcript filed by the director, which is now before us, as the record in the case.
 
 
 5
 Ceiling Price Regulation 5, Collation 1, in part, provides:
 
 
 6
 "A — Scope of the Regulation.
 
 
 7
 "Section 1. What this regulation does and prohibitions. (a) This regulation establishes ceiling prices and fees for:
 
 
 8
 "(1) All sales and deliveries, including export sales and sales for export, by any person of prepared and unprepared scrap." (Emphasis supplied.)
 
 
 9
 Section 3 of the regulation provided for ceiling prices founded on the basing points of forty-one cities. The basing point prices for steel scrap, of dealer and industrial origin, from which maximum shipping prices were to be computed, for the base grade, No. 1 bundles, Grade 1, were set forth, with the various differences of price per gross ton dependent upon the location of the specified cities.
 
 
 10
 Differentials which were allowed, above or below the prices theretofore enumerated, for grades of steel scrap other than the base grade, No. 1 bundles, Grade 1, were also set forth in thirty-three different classifications of steel scrap, numbered from 2 to 34[1]. Classifications numbered from 2 to 10, inclusive, were entitled: "Open Hearth and Blast Furnace Grades." Classifications numbered from 11 to 31, inclusive, were entitled: "Electric Furnace and Foundry Grades." Classifications of steel scrap numbered from 32 to 34, inclusive, were entitled: "Unprepared Grades."
 
 
 11
 The "Unprepared Grades" comprised, within the language of the regulation:
 
 
 12
 "32. Unprepared steel scrap which when compressed constitutes No. 1 bundles
 
 
 13
 "33. Unprepared steel scrap which when compressed constitutes No. 2 bundles
 
 
 14
 "34. Unprepared steel scrap other than material suitable for hydraulic compression"
 
 
 15
 Since Section 1 of the regulation provides for the establishment of ceiling prices for all sales of "prepared and unprepared scrap," and Section 3 of the regulation provides for differentials with respect to the various grades of steel scrap, in which the last three grades enumerated — from 32 to 34, inclusive — are set forth under the title, "Unprepared Grades," the inference is almost inescapable that all other grades, entitled "Open Hearth and Blast Furnace Grades" and "Electric Furnace and Foundry Grades," are considered "Prepared Grades," in contrast to those denominated, "Unprepared Grades."
 
 
 16
 We proceed, then, to the consideration of Section 28(n) of Price Regulation 5, which provides:
 
 
 17
 "`Unprepared scrap.' The term shall have its customary trade meaning and shall not include such demolition projects as automobiles, bridges, rail abandonments, vessels, and locomotives, cranes, freight cars and similar equipment on its own wheels. Prior to demolition such projects are not iron and steel scrap and must be priced under the applicable provisions of the General Ceiling Price Regulation."
 
 
 18
 Complainants, in attacking the above section of the regulation, submit that "unprepared scrap" has no customary trade meaning; that the regulation is, therefore, void for vagueness and uncertainty; and they allude to the fact that in Section 23 of the regulation, Grades 2 to 31, inclusive — here claimed by the government to constitute the "Prepared Grades" — are identified and described in detail according to their weight, size, and other characteristics. They compare these specifications, which are set forth at length, with the fact that no specifications whatever are to be found in the regulation for the so-called unprepared grades, and that only in Section 28(n) is "Unprepared scrap" defined as that which is such in the customary meaning of the term. Complainants argue that this definition is inadequate for the reason above alleged — that there is no customary meaning of the term; and that if "Unprepared scrap," as set forth in Section 3 of the regulation, were intended to be understood as embracing all grades not included in Grades 2 to 31, inclusive, therein enumerated, it would have been easy so to state that fact in the regulation in order that those bound by its terms could understand it, which, it was alleged, was impossible in its present form.
 
 
 19
 Proof was, however, introduced by the government, through the testimony of Mr. David C. Holub, that unprepared scrap had a customary trade meaning. Mr. Holub was an experienced man in the industry and, for thirty-four years, had conducted his own scrap iron businesses in Akron and Youngstown. He was an organizer, founder, and, at the time his evidence was taken, First Vice President of the Institute of Scrap Iron and Steel, Inc., an organization having a membership of more than 1200 firms in the industry, with headquarters in Washington, D. C. He was also, at that time, Chief of the Iron and Steel Branch, Industrial Materials and Manufactured Goods Division, in the National Office of the Office of Price Stabilization in Washington. Mr. Holub stated that Section 3 of Ceiling Price Regulation 5 qualifies as prepared scrap, the scrap which is usable in any one of the standard furnace or foundry operations, namely Grades 2 through 31, the specifications of these various grades with respect to weight, size, and other characteristics being given in detail in Section 23 of the regulation. According to these specifications, as pointed out by Mr. Holub, prepared scrap is scrap of a specified condition and quality which will lie flat in the charging box of the standard furnace,[2] or, as to certain pieces, will lie conveniently over the contents of the charging box when filled. While specifications for the various grades differ, the government's evidence was to the effect that any scrap which conforms to the specifications for any one of the Grades 2 to 31, inclusive, is considered "prepared." Furthermore, Mr. Holub observed that the regulation designated as "Unprepared scrap," Grades 32 through 34; that "Unprepared scrap" had and does have a customary trade meaning; and that, according to this customary trade meaning, unprepared scrap means all steel scrap which is not included in Grades 2 through 31. He further stated that Section 28(n) of Ceiling Price Regulation 5 refers only to the fact that "Unprepared scrap," in the customary meaning of that term, does not include demolition projects.
 
 
 20
 Complainants filed affidavits countering the evidence of the government, to the effect that there was no customary meaning of the term, "Unprepared scrap;" that whether scrap was prepared or unprepared depended upon the individual needs and melting facilities of the various purchasers; and that, if any uniform meaning could be attributed to the term, it meant only those items of scrap "which in their then condition were not usable in a particular consumer's melting facilities." Mr. Holub, in his affidavit, replied with a denial that the customer's individual melting facilities determined whether scrap was prepared or unprepared. He declared that the prevalent practice among brokers in the industry was to take orders for scrap on behalf of undisclosed customers and that often the broker, in such a case, did not even know the destination of the purchase or the dimensions of the furnaces of the customer, and that, accordingly, the terms, prepared or unprepared scrap, could in no wise be dependent upon the customer's melting facilities.
 
 
 21
 From the foregoing, we are of the opinion that the regulation was not void on the ground that it was vague and indefinite. It provided for all recognized grades of steel scrap, and governed all types of prepared and unprepared scrap. Although the grades from 2 to 31, inclusive, were not, in the regulation, entitled "Prepared Grades," nevertheless, the classifications that followed — 31 to 34, inclusive — were entitled "Unprepared Grades;" and it would seem obvious that any steel scrap items, not included in the "Unprepared Grades," would fall within the prepared grades, as these were the only other grades that constituted the subject matter of the regulation. Since the regulation applied only to prepared and unprepared grades, grades other than those set forth under the title, "Unprepared," must have been "Prepared." Moreover, we find that the evidence clearly preponderates in favor of the government's contention that there is a customary trade meaning of the term, "Unprepared scrap," and that such scrap consists of all not included within the Grades 2 to 31, inclusive, as enumerated in Section 3 of the regulation.
 
 
 22
 A concluding observation may here be made. Complainants, as above remarked, were indicted in the district court on a charge of paying prices for unprepared steel scrap in excess of those permitted by the price regulation. The regulation specifically governed both prepared and unprepared steel scrap and, as stated above, enumerated several grades under the title of "Unprepared Grades." Moreover, as heretofore mentioned, it was set forth that the term, "Unprepared scrap," in the regulation, was accorded its customary trade meaning. Complainants, in purchasing the steel scrap in question, had the right, under Price Procedural Regulation 1, to request an official interpretation or clarification of the regulation if they were in doubt as to what constituted unprepared scrap; and if they had acted pursuant to such interpretation or clarification, they would have been immune to prosecution. The activities of complainants were being carried on in the most sensitive area of the regulation where, if they had any doubt as to what constituted unprepared scrap, they should, in ordinary prudence, have asked for clarification of the regulation, for their own protection. It is to be said that the determination in this case has a bearing upon the pending proceedings in the district court only because it does not end them, as it would if the regulation were held invalid. In the case pending in the district court, however, the government must not only prove that complainants' conduct in violating the regulation was willful, but that they are guilty of the offenses charged beyond a reasonable doubt.
 
 
 23
 With respect to complainants' contention that the regulation unlawfully delegated the function of defining unprepared scrap to private individuals, and that the regulation was ambiguous in that it purported to apply more than one ceiling price to the same scrap items, we find these claims to be without merit.
 
 
 24
 The determination of other interesting questions, ably discussed in the briefs and on the argument of the case, we find unnecessary to decision.
 
 
 25
 In accordance with the foregoing, a judgment will be entered dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 Grade 35 was added by Amendment 9, issued July 25, 1952, but has no application to this case
 
 
 [2]
 A charging box of the standard furnace is five feet long and eighteen inches wide, and designed to handle steel scrap